## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ROBERT L. ORD**

                              **Plaintiff**

**v.**

**DISTRICT OF COLUMBIA**

                              **Defendant**

**Case Number**
**1:08-CV-00704**

**Judge John D. Bates**

## MEMORANDUM OF LAW AND AUTHORITY IN OPPOSITION TO THE THE DEFENDANT'S MOTION TO DISMISS AND IN REPLY TO ITS OPPOSITION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 (b), the Plaintiff has moved this Court to enter a Preliminary Injunction immediately restraining the Defendant, its officers, agents, servants, employees and/or attorneys from prosecuting or arresting the Plaintiff for alleged violations of D.C. Code § 7-2507.01 or other such laws to which the Plaintiff is afforded exemption by virtue of his status as a law enforcement agent of the Commonwealth of Virginia. Docket # 3. The Defendant has moved to dismiss. Docket # 7.

## STATEMENT OF FACTS[1]

---

[1] The original Complaint (Docket #1) was drafted in short order concurrent to applications for emergency injunctive relief. Certain elements of the Plaintiff's cause of action such as damages remain in a fluid state and others have developed since the time of the filing of the Complaint, including those so reflected in the Plaintiff's affidavit filed concurrent to this document. Docket # 9. The Plaintiff foresees amendments to the Complaint as circumstances warrant to conform to the evidence as provided by Rule 15(d).

1.      On June 8, 2007, the Plaintiff was appointed by the Virginia Circuit Court of Orange County as a Special Conservator of the Peace for the Commonwealth of Virginia.  Pl.'s Ex. A.

2.      The Plaintiff's order of appointment stated *inter alia*, that the Plaintiff "[s]hall have and be entitled to all the powers, functions, duties, responsibilities and authority of any other Conservator of the Peace… within the County of Orange, Virginia".  Id. at 2.

3.      The Plaintiff's order of appointment authorized the Plaintiff to carry firearms while acting in the course of his duties.  Id. at 4.

4.      The Plaintiff's order of appointment further stated that the Plaintiff "is designated as a 'Qualified Law Enforcement Officer'" for certain provisions of Virginia and Federal law, including the Law Enforcement Officer's Safety Act of 2004, 18 U.S.C. 926B.  Id. at 3.

5.      This order and each of its operative provisions was in effect for all times relevant to this Complaint.

6.      By virtue of this appointment, the Plaintiff was for all times relevant to this Complaint, and is presently, a law enforcement agent of the Commonwealth of Virginia.

7.      On February 2, 2008, the Defendant's Metropolitan Police Department (MPD) announced its intention to prosecute Virginia Special Conservators of the Peace for any possession of weapons within the District of Columbia.  Pl.'s Ex. B.

8.      On April 17, 2008, the Defendant's employee and agent, MPD Detective Kimberly Marshall made an application for an arrest warrant against the Plaintiff,

alleging that the Plaintiff had violated D.C. Code § 7-2507.01 (a), *to wit*, that the Plaintiff

had possessed unregistered firearms and ammunition on or about April 4, 2008.  D.C.

Sup. Ct. Criminal, 2008 CRW 1441, Pl.'s Ex. C.

9.       Within Detective Marshall's affidavit in support, no mention was made of

the Plaintiff's status as a Special Conservator of the Peace for the Commonwealth of

Virginia.  Id.

10.      Such status was a matter of public record.  *See* Pl.'s Ex. A.

11.      Such status was contained within the Plaintiff's records contained within

the National Crime Information Center (NCIC) database and was readily available to the

Defendant and its agents.  *See* Pl.'s Ex. A at 3 (Circuit Court's order to the Department of

State Police to enter the Plaintiff's information into the Virginia Criminal Information

Network (VCIN)).

12.      Such status was announced to the Defendant's agents by the Plaintiff and

was known to Detective Marshall and her supervisors within MPD prior to the

application.

13.      At no time relevant to the arrest warrant was the Plaintiff legally

disqualified from possessing firearms under Federal or Virginia State law.

14.      On April 22, 2008, the Plaintiff's counsel provided evidence to the

Criminal Section Chief of the District of Columbia Office of the Attorney General

(OAG) of the Plaintiff's status as a law enforcement agent of the Commonwealth of

Virginia.

15.      The Plaintiff's Counsel demanded the *nolle prosequi* of the criminal

Information in support of the warrant.

16.     Shortly thereafter, the OAG announced to the Plaintiff's counsel that it "will not go forward with this warrant".

17.     Several hours later, the Plaintiff's counsel learned that the OAG had changed its position and had not withdrawn the warrant.  Pl.'s Ex. D.

18.     The Plaintiff's counsel immediately moved the Superior Court to dismiss the Information and quash the warrant.   D.C. SUP. CT. CRIMINAL, 2008 CNC 236.

19.     Shortly before a Judge-in-Chambers hearing on April 24, 2008, the OAG declared a *nolle prosequi* of the Information in support of the warrant.  Pl.'s Ex. C.


**ARGUMENT**

**1.  The Defendant's application and receipt of a warrant for the Plaintiff's arrest overcomes the Defendant's pre-enforcement standing issue.**

Unlike Plaintiffs in Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007) and Seegars v. Ashcroft, 396 F.3d 1248 (D.C. Cir. 2005), the Defendant has applied for and received a warrant for the Plaintiff's arrest.  The Defendant's Metropolitan Police Officers made affirmative efforts to execute the warrant.  Docket # 9, ¶ 24.  The Defendant's prosecutors endeavored to prevent the Plaintiff from quashing what they knew to be an illegal warrant.  Pl.'s Ex. D.  Together with the Defendant's MPD Memorandum (Pl.'s Ex. B) expressly targeting Virginia Special Conservators of the Peace such as the Plaintiff, these amount to "a threat of prosecution under the statute which is credible and immediate, and not merely abstract or speculative."  Navegar, Inc. v. United States, 103 F.3d 994, 999 (D.C. Cir. 1997).

> A credible threat of imminent prosecution can injure the threatened party by putting her between a rock and a hard place--absent the availability of preenforcement review, she must either forego possibly lawful activity because of

her well-founded fear of prosecution, or willfully violate the statute, thereby
subjecting herself to criminal prosecution and punishment.  In such situations the
threat of prosecution provides the foundation for justiciability as a constitutional
and prudential matter, and the Declaratory Judgment Act, 28 U.S.C. § 2201
(1994), provides the mechanism for seeking preenforcement review in federal
court.

Id., 103 F.3d at 998 [internal citations omitted].

The question of whether a threat of prosecution adequate to satisfy the
requirements of justiciability is present in any particular preenforcement
challenge is a factual and case-specific one. Federal courts look to a variety of
factors to determine whether the plaintiff's decision to forego certain activity is
truly motivated by a well-founded fear that engaging in the activity will lead to
prosecution under the challenged statute.

Id., 103 F.3d at 999.

None of the District of Columbia pre-enforcement challenge cases cited by the

Defendant involved the issuance of an arrest warrant for a violation of the challenged

law.   Seegars; Parker; Navegar.

When plaintiffs "do not claim that they have ever been threatened with
prosecution, that a prosecution is likely, or even that a prosecution is remotely
possible," they do not allege a dispute susceptible to resolution by a federal court.

Babbitt v. UFW Nat'l Union, 442 U.S. 289, 298-299 (1979) (quoting Younger v. Harris,

401 U.S. 37, 42, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971)).  Certainly, the issuance of an

arrest warrant in the Plaintiff's name rises to a showing "that the District had singled

[him] out for prosecution…" Parker, 478 F.3d at 374.


**2.    The Defendant's false claims and bad faith in initiating and perpetuating
the Plaintiff's prosecution justify the Federal Court's immediate
intervention.**

In Ex parte Young, 209 U.S. 123, the fountainhead of federal injunctions against state

prosecutions, the Court characterized the power and its proper exercise in

broad terms: it would be justified where state officers ". . . threaten and are about

to commence proceedings, either of a civil or criminal nature, to enforce against

> parties affected an unconstitutional act, violating the Federal Constitution . . . ." 209 U.S. at 156. Since that decision, however, considerations of federalism have tempered the exercise of equitable power, for the Court has recognized that federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework. It is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings.

Dombrowski v. Pfister, 380 U.S. 479, 485, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965).

The Plaintiff herein alleges that Metropolitan Police Officers raided the Plaintiff's worksite without a warrant[2] and arrested the Plaintiff's employees without a warrant upon false claims that the Plaintiff's company was not licensed work in the District of Columbia. See Pl.'s Ex. E. These officers then tried under false pretenses to persuade the Plaintiff to enter the District of Columbia so that they could arrest him without a warrant. Docket # 9, ¶ 19. These officers then falsified an oath in support of the warrant for the Plaintiff's arrest, despite no allegation of the Plaintiff ever being present in the District. Pl.'s Ex. C. The Plaintiff further alleges that the Defendant's prosecutor made false representations to the Plaintiff's counsel to prevent counsel from seeking review of the warrant in Superior Court for several days. Pl.'s Ex. D. The Plaintiff then alleges that members of the Metropolitan Police Department continued affirmative efforts to

---

[2] The affidavit in support of the warrant for the Plaintiff's arrest falsely claims that the officers "conducted a routine site inspection" of the Plaintiff's worksite. Pl.'s Ex. C at 4. The Plaintiff is prepared to demonstrate with eyewitness testimony that twelve officers stormed the school with their guns drawn. By falsely claiming an administrative inspection, the Defendant would otherwise overcome Fourth Amendment limitations on searches. See, e.g., New York v. Burger, 482 U.S. 691, 702-704, 96 L. Ed. 2d 601, 107 S. Ct. 2636 (1987) (warrantless administrative inspection of premises of "closely regulated" business); Michigan v. Tyler, 436 U.S. 499, 507-509, 511-512, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978) (administrative inspection of fire-damaged premises to determine cause of blaze); Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 534-539, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967) (administrative inspection to ensure compliance with city housing code). Instead, the officers conducted a warrantless raid on the premises absent any exigent circumstances. By their own admission, the officers were aware of the alleged facts and circumstances for three days prior to the raid, giving them more than adequate time to apply for a search warrant. The search of the Plaintiff's worksite was unlawful. Payton v. New York, 445 U.S. 573, 583, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980).

execute the warrant during the intervening period after the prosecutor was notified of the

Plaintiff's status as a law enforcement agent of the Commonwealth until the warrant was

declared *nolle prosequi* on April 24, 2008.  The Plaintiff finally alleges that the *nolle*

*prosequi* was declared only minutes before a scheduled Superior Court hearing and only

for the purpose of preventing the Plaintiff from receiving judicial review of his claimed

exemption from the operative provisions of the statute.

> "Extraordinary circumstances" may include showings of "bad faith" or
> "harassment" by state officials, or where the local law to be applied is "flagrantly
> and patently violative of express constitutional prohibitions." *JMM*, 378 F.3d at
> 1122 (quoting *Trainor v. Hernandez*, 431 U.S. 434, 441 (1977)). Mere allegations
> of bad faith, unsupported by the record, are insufficient to warrant federal
> intervention in the local proceeding. *See, e.g., Kugler v. Helfant*, 421 U.S. 117,
> 126 n.6 (1975); *Perez v. Ledesma*, 401 U.S. 82, 85 (1971)).

Docket # 7 at 13, n. 9.

> Supported by affidavits and a written offer of proof, the complaint further alleges
> that the threats to enforce the statutes against appellants are not made with any
> expectation of securing valid convictions, but rather are part of a plan to employ
> arrests, seizures, and threats of prosecution under color of the statutes to harass
> appellants…

Dombrowski, 380 U.S. at 482.

> The appellants in Dombrowski had offered to prove that their offices had been
> raided and all their files and records seized pursuant to search and arrest warrants
> that were later summarily vacated by a state judge for lack of probable cause.
> They also offered to prove that despite the state court order quashing the warrants
> and suppressing the evidence seized, the prosecutor was continuing to threaten to
> initiate new prosecutions of appellants under the same statutes, was holding
> public hearings at which photostatic copies of the illegally seized documents were
> being used, and was threatening to use other copies of the illegally seized
> documents to obtain grand jury indictments against the appellants on charges of
> violating the same statutes. These circumstances, as viewed by the Court
> sufficiently establish the kind of irreparable injury, above and beyond that
> associated with the defense of a single prosecution brought in good faith, that had
> always been considered sufficient to justify federal intervention.

Younger, 401 U.S. at 49.

The Defendant's suggestion of abstention under <u>Younger</u> and <u>JMM Corp. v. District of Columbia</u>, 378 F.3d 1117 (D.C. Cir. 2004) is without foundation.

> Similarly here, to the extent any local criminal proceedings are ever initiated, they would be judicial in nature and implicate important District interests; the proceedings would afford plaintiff an adequate opportunity to litigate his constitutional claims…

Docket # 7 at 13.

Criminal proceedings have already been initiated against the Plaintiff by the Defendant.  Pl.'s Ex. C.  After the Defendant's Metropolitan Police Officers failed to apprehend the Plaintiff on their outstanding illegal warrant for several days, the Defendant's prosecutor declared a *nolle prosequi* of the warrant, just minutes before a hearing was scheduled to adjudicate these Constitutional claims in the Superior Court.

The Defendant's affirmative efforts to deny the Plaintiff the "opportunity to litigate his constitutional claims" were the very cause for filing the instant case.   The denial of this venue to declare his rights and legal relations only serves to further the Defendant's present efforts to harass the Plaintiff and hinder his efforts to travel to, and do business in, the District of Columbia.  The potential reissuance of the warrant, or an otherwise unjustified warrantless arrest, lies above the Plaintiff "'[l]ike the sword of Damocles,' he knows it is there, but not whether or when it will fall."  <u>Norfolk & Western Ry. v. Ayers</u>, 538 U.S. 135, 150,  155 L. Ed. 2d 261, 123 S. Ct. 1210 (2003) (quoting <u>Alley v. Charlotte Pipe & Foundry Co.</u>, 159 N. C. 327, 331, 74 S. E. 885, 886 (1912)).

The Defendant's suggestion that the Plaintiff cannot demonstrate "the existence of a willful, wanton, reckless or oppressive disregard for the rights of the plaintiff", <u>Jackson v. District of Columbia</u>, 2008 U.S. Dist. LEXIS 25263, 8 (D.D.C. Mar. 31, 2008)

(quoting <u>Tyler v. Central Charge Serv., Inc.</u>, 444 A.2d 965, 969 (D.C. 1982)), is

disingenuous.

> In *Jackson*, the plaintiff claimed malicious prosecution, alleging that the police
> officer sought an arrest warrant without an investigation, in "reckless disregard
> for plaintiff's right to be free from unreasonable seizures." *Jackson*, *supra*. The
> court rejected the claim, finding that the plaintiff there was not immediately
> arrested, the officer instead sought a warrant for his arrest, discussed the warrant
> application with two different attorneys at the prosecutor's office, and brought the
> application to a judge, who signed it. *Id*. The court held that these undisputed
> facts precluded a finding of malice.

> Similarly here, plaintiff was never arrested, the officer brought the application to a
> judge, who signed it, notwithstanding that the warrant was later declared *nolle
> prosequi*. On these allegations, plaintiff cannot show the necessary malice. *See
> also Jackson, supra*, at *7 ("probable cause exists if the facts and circumstances
> known to the arresting officer warrant a prudent man in believing that [an] offense
> has been committed.") (quoting *Dent v. May Dept. Stores Co.*, 459 A.2d 1042,
> 1044 (D.C. 1982)).

Docket #7 at 15.

In the instant case, the Plaintiff alleges Metropolitan Police Officer(s)

*intentionally falsified* an affidavit in support of their application for a warrant for the

Plaintiff's arrest, first, by omitting the fact known to them that the Plaintiff was a law

enforcement agent of the Commonwealth of Virginia, second, by any implication that the

Plaintiff was present within the District of Columbia to commit an offense, and third by

claiming that the arrest of his employees was the result of an administrative inspection of

his worksite.  *See* note 2, *supra*. "Where the question of whether an arresting officer had

probable cause is predominantly factual in nature, as where there is a dispute as to the

pertinent events, the existence *vel non* of probable cause is to be decided by the jury."

<u>Murphy v. Lynn</u>, 118 F.3d 938, 947 (2d Cir. 1997) (citing <u>Weyant v. Okst</u>, 101 F.3d 845,

852 (2d Cir. 1996); <u>Moore v. Comesanas</u>, 32 F.3d 670, 673 (2d Cir. 1994); Restatement

(Second) of Torts § 673(2)(a) & comment h (1977)).

> Whether DePietro and Borona watched the tape before (falsely) telling Russo that the robber was tattooed, or failed to follow up on Russo's claims of innocence by refusing to watch the tape at all, their conduct easily fits the hypothetical presented in Justice Blackmun's <u>Baker</u> concurrence: that the standard for liability announced by the Court would reach an officer who "refused to check the identity of a complaining prisoner against *readily available* mug shots and fingerprints." *See* [<u>Baker v. McCollan</u>, 443 U.S. 137, 148, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)] (Blackmun, J., concurring) (emphasis added).  An officer's duty to investigate specific, readily-verifiable claims of innocence in a reasonable time period clearly covers reviewing a surveillance camera video record of a crime, when, as here, it was an easily available piece of physical evidence.

<u>Russo v. City of Bridgeport</u>, 2007 U.S. App. LEXIS 16171, 32-33 (2d Cir. Feb. 27, 2007).  No probable cause existed for the Metropolitan Police Officers to arrest the Plaintiff.   His status as law enforcement was known to them and could be further readily confirmed by an NCIC query.   Inapposite to the Defendant's present suggestion, this "omission" (Docket # 7 at 16) completely exempted the Plaintiff from the operative section of the code under which he was charged and therefore no probable cause existed to arrest him.

> **3.  The Plaintiff has already suffered substantial cognizable and irreparable injury as a reasonably foreseeable (and in all likelihood, the intended) result of this claimed Fourth Amendment deprivation.**

Unlike most ordinary false arrest or malicious prosecution cases, the Plaintiff does not claim that the Defendant or its agents physically seized his person or property, or that he was subjected to post-arraignment limitations on his freedom.  Instead, it was the pendency of the arrest warrant which caused the Plaintiff's reasonable fear of unwarranted prosecution and prolonged incarceration in a foreign jurisdiction and subsequently deprived the Plaintiff of the quiet enjoyment of his home, the consortium of his wife, the ability to conduct his pending business affairs and the freedom to travel both within Virginia and the District of Columbia.

The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person--i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of "seizure." This requirement is necessary to ensure that the § 1983 plaintiff has suffered a harm of constitutional proportions--i.e., a harm cognizable under § 1983. The Supreme Court has "said that the accused is not 'entitled to judicial oversight or review of the decision to prosecute.'"  [Albright v. Oliver, 510 U.S. 266, 275, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)] (quoting Gerstein v. Pugh, 420 U.S. 103, 118-119, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975)). That pronouncement is consonant with the principle that "the abstract value of a constitutional right may not form the basis for § 1983 damages." Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 308, 91 L. Ed. 2d 249, 106 S. Ct. 2537 (1986). Rather, an award of "damages must always be designed 'to compensate injuries caused by the [constitutional] deprivation . . . .'" Id. at 309 (quoting Carey v. Piphus, [435 U.S. 247, 265, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978)]) (alteration in original).

Singer v. Fulton County Sheriff, 63 F.3d 110, 116 (2d Cir. N.Y. 1995) [footnote omitted].

The Plaintiff alleges a substantial loss of future earnings caused by the deprivation, including the loss of at least part of his contract with Mervis Diamond Importers.  Docket # 9, ¶ 32.

As we stated in Monroe v. Pape, 365 U.S. 167, 187 (1961), § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link.

Malley v. Briggs, 475 U.S. 335, 345, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986).

Even if the Defendant where to successfully challenge causation, if not the existence, of the very substantial damages claimed herein, this Court remains with jurisdiction and authority to award nominal and punitive damages to the Plaintiff, as well as costs.  Carey, 435 U.S. at 267 ("A number of lower federal courts have approved the award of nominal damages under § 1983 where deprivations of constitutional rights are not shown to have caused actual injury. E.g., Thompson v. Burke, 556 F. 2d 231, 240 (3d

11

Cir 1977); United States ex rel. Tyrrell v. Speaker, 535 F. 2d, at 829-830; Magnett v.

Pelletier, 488 F. 2d 33, 35 (1st Cir 1973); Basista v. Weir, 340 F. 2d, at 87; Bell v. Gayle,

384 F. Supp. 1022, 1026-1027 (ND Tex. 1974); United States ex rel. Myers v. Sielaff,

381 F. Supp. 840, 844 (ED Pa. 1974); Berry v. Macon County Bd. of Ed., 380 F. Supp.

1244, 1248 (MD Ala. 1971).")   See also Lewis v. Woods, 848 F.2d 649, 651 (5th Cir.

1988) ("A violation of constitutional rights is never *de minimis*, a phrase meaning so

small or trifling that the law takes no account of it.")

> Moreover, the Supreme Court has recognized that deprivations of a small amount of property, if intentionally inflicted and incapable of redress through post-deprivation state procedures, may contravene the due process clause. In Goss v. Lopez, the Court held that a public school's temporary suspension of a child implicated due process because of the deprivation of educational benefits: "The Court's view has been that as long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." And later, in a portion of Parratt v. Taylor that has not been overruled, the Court held that a hobby kit valued at $23.50 was "property" within the meaning of the Fourteenth Amendment.  We cannot agree with the district court, therefore, that Lewis's alleged property loss was *de minimis*. The Supreme Court has recognized even smaller losses as not only worthy of legal redress but as possibly implicating constitutional rights.

Lewis, 848 F.2d at 651 [footnote omitted].

> Punitive damages are available in section 1983 actions when the defendant's conduct "involves reckless or callous indifference to the federally protected rights of others."

Brown v. Byer, 870 F.2d 975, 982 (5th Cir.1989) (quoting Smith v. Wade, 461 U.S. 30,

56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983)).

### 4.  The Plaintiff's defenses to the prior prosecution and his present claims require interpretation and application of Federal law.

Unlike in Barwood, Inc. v. District of Columbia, 202 F.3d 290 (D.C. Cir. 2000),

the Plaintiff does not allege that the Defendant violated a District of Columbia law.  Id. at

292 ("Plaintiffs pursued this injunction--and so far as appears the entire lawsuit--almost

exclusively on the basis of violations of District of Columbia law.")  The Plaintiff herein

alleges that the Defendant's agents made application for a warrant for his arrest absent

probable cause that he committed any offense, in violation of the Fourth Amendment.

Such an infringement is actionable in this Court under 42 U.S.C. § 1983.  "Had state law

not been mentioned at all, there would be no question about our jurisdiction...."

Delaware v. Prouse, 440 U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979) (quoting

Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 568, 53 L. Ed. 2d 965, 97

S. Ct. 2849 (1977)).  The defects in probable cause included the fatal absence of any

allegation that the Plaintiff was ever present within the District of Columbia.  The

Constitutional deficiency of the warrant application can be entirely adjudicated upon the

simple absence (or the false implication) of an allegation of jurisdiction of the Superior

Court to render judgment upon the Plaintiff for a violation of the District's criminal code.

> Under D.C. Code § 11-923 (b)(1) (1981), "the Superior Court has jurisdiction of any criminal case under any law applicable exclusively to the District of Columbia." We have recently stated that this language is interpreted "to limit the jurisdiction of the Criminal Division of the Superior Court to criminal acts which occur within the geographical boundaries of the District of Columbia." United States v. Baish, 460 A.2d 38, 40 (D.C. 1983) (emphasis added) (citing Jackson v. United States, 441 A.2d 1000, 1004 (D.C. 1982)); In re L.M., 432 A.2d 692, 695 (D.C. 1981); Mundine v. United States, 431 A.2d 16, 17 (D.C. 1981); In re A.S.W., 391 A.2d 1385, 1390 (D.C. 1978). Upon review of the instant record, we conclude that there was no evidence that appellant received stolen furniture in the District of Columbia.

James v. United States, 478 A.2d 1083, 1085 (D.C. 1984) [footnote omitted].

The Plaintiff further offers two statutory exemptions to any prosecution for the

offense alleged, one expressly within the D.C. Code section for which he was charged

and one arising under Federal law.  Both require an interpretation of Virginia law and similar factual inquiry.

### a.  The Plaintiff is a law enforcement agent of the Commonwealth of Virginia and therefore exempt from D.C. Code § 7-2502.01.

D.C. Code § 7-2502.01 provides a blanket exception for law enforcement officers under any circumstances.

(b) Subsection (a) of this section shall not apply to:

> (1) Any law enforcement officer or agent of the District or the United States, or any law enforcement officer or agent of the government of any state or subdivision thereof…

D.C. CODE § 7-2502.01.

The Plaintiff is a law enforcement agent of the Commonwealth of Virginia. He has been appointed by the Orange County Circuit Court as a Special Conservator of the Peace.  Pl.'s Ex. A.  The order of appointment provides that the Plaintiff "[s]hall have and be entitled to all the powers, functions, duties, responsibilities and authority of any other Conservator of the Peace".  Pl.'s Ex. A at 2.  A Conservator of the Peace is a public official authorized to conserve and maintain the public peace. BLACK'S LAW DICTIONARY, 6TH ED.  Under Virginia law, Conservators of the Peace include state judges, state prosecutors, magistrates and

> any special agent or law-enforcement officer of the United States Department of Justice, National Marine Fisheries Service of the United States Department of Commerce, Department of Treasury, Department of Agriculture, Department of Defense, Department of State, Office of the Inspector General of the Department of Transportation, Department of Homeland Security, and Department of Interior; any inspector, law-enforcement official or police personnel of the United States Postal Inspection Service; any United States marshal or deputy United States marshal whose duties involve the enforcement of the criminal laws of the United States; any officer of the Virginia Marine Police; any criminal investigator of the

Department of Professional and Occupational Regulation, who meets the minimum law-enforcement training requirements established by the Department of Criminal Justice Services for in-service training; any criminal investigator of the United States Department of Labor; any special agent of the United States Naval Criminal Investigative Service, any special agent of the National Aeronautics and Space Administration, and any sworn municipal park ranger, who has completed all requirements under § 15.2-1706…

CODE OF VIRGINIA § 19.2-12.

Conservators of the Peace are not private security guards.  *See* Frias v. Commonwealth, 34 Va. App. 193, 200 (2000) ("Furthermore, appellant contends that a common law definition of 'conservator of the peace' exists which encompasses 'registered armed security officers.' Appellant cites no authority for this assertion. We find none.")  The law enforcement power of a Virginia Conservator to arrest without a warrant is expressly set forth by Virginia law.

Every conservator of the peace shall have authority to arrest without a warrant in such instances as are set out in §§ 19.2-19 and 19.2-81. Upon making an arrest without a warrant, the conservator of the peace shall proceed in accordance with the provisions of § 19.2-22 or § 19.2-82 as the case may be.

VA. CODE § 19.2-18.  Section § 19.2-81 is the operative code section which grants warrantless arrest authority to members of the Virginia State Police, a Virginia Sheriff or the members of "any duly constituted police force" of any county, city or town of the Commonwealth.  A Special Conservator of the Peace has the authority to issue a court summons on behalf of the Commonwealth for such criminal offenses so provided.  Id. § 19.2-74.

As do many others, the Defendant misunderstands the authority of a Conservator of the Peace.  *See e.g.* Terrell v. Petrie, 763 F.Supp. 1342, 1347 (E.D.Va. 1991) (claiming, without any authority in support, that "conservators of the peace have limited

powers"). The Conservator of the Peace is the most ancient and established office of law

enforcement from which all other forms are derived.

> While the old writers do not, in express terms, speak of *police officers* as among
> those who have the right as conservators of the peace to make arrests without
> warrant, they do refer to *a class of officers*, conservators of the peace, as having
> that right.

State v. Bowen, 17 S.C. 58, 61 (1882) [emphasis in original].

> As conservator of the peace in his county or bailiwick, he is the representative of
> the king, or sovereign power of the State for that purpose. He has the care of the
> county, and, though forbidden by *magna charta* to act as a justice of the peace in
> trial of criminal cases, he exercises all the authority of that office where the public
> peace was concerned. He may upon view, without writ or process, commit to
> prison all persons who break the peace or attempt to break it; he may award
> process of the peace, and bind any one in recognizance to keep it. He is bound, *ex
> officio*, to pursue and take all traitors, murderers, felons, and other misdoers, and
> commit them to jail for safe custody

South v. Md., 59 U.S. (18 How.) 396, 401, 15 L. Ed. 433 (1856) (citing 1 Blackstone's

COMMENTARIES 343; 2 Hawk, P.C.C. 8, § 4).

> …where an individual… acts as a conservator of the peace, he… represents the
> sovereign power of the State for that purpose, and is entitled to all the immunities
> of such sovereign; and that the right to hold the State, or its duly delegated agents,
> responsible for a failure to conserve the peace, rests only upon express statute,
> and does not exist otherwise.

State use of Cocking v. Wade, 87 Md. 529, 40 A. 104 (1898) (citing State v. Mayor and

City Council of N. O., 109 U.S. 285, 27 L. Ed. 936, 3 S. Ct. 211 (1883); M. & C. C. of

Balto. v. Poultney, 25 Md. 107 (1866); M. & C. C. of Hagerstwon v. Dechert, 32 Md.

369 (1870); M. & C. C. of Hagerstown v. Sehner, 37 Md. 180 (1872)).

The Superior Court occasioned to analyze the definition of "law enforcement

officer" for the purpose of exemptions from District of Columbia weapons laws in U.S. v.

Savoy, D.C. Super. Ct. Crim. No. F-5748-98 (2001). THE DAILY WASHINGTON LAW

REPORTER, Vol. 129, Num. 89, 877.

The District of Columbia Court of Appeals has consistently held that individuals whose job is primarily to protect property, rather than life, are not considered "police officers or other duly appointed law-enforcement officers" for the purposes of Section 22-3205. <u>McKenzie v. United States</u>, 158 A.2d 912, 914 (D.C. 1960), <u>Franklin v. United States</u>, 271 A.2d 784, 786 (D.C. 1970), <u>Timus v. United States</u>, 406 A.2d 1269, 1272 (D.C. 1979). Special police officers are not covered *Per Se* by Section 22-3205 because, by statute, they are appointed "for duty in connection with the property of" their employer. D.C. Code Ann. § 4-114 (1981).

…the critical question was whether, by his employment, defendant's primary responsibility as a "police officer" was the protection of life and therefore a "policeman or other duly appointed law-enforcement officer" as defined by Section 22-3205.

<u>Savoy</u> at 878, discussing predecessor to D.C. CODE § 22-4505.

Virginia Special Conservators of the Peace are appointed "upon the showing of a necessity for the security of property *or the peace*". VA. CODE § 19.2-13 [emphasis added].

Sheriffs are, *ex officio*, conservators of the peace within their respective counties, and it is their duty, as well as that of all constables, coroners, marshals and other peace officers, to prevent every breach of the peace, and to suppress every unlawful assembly, affray or riot which may happen in their presence.

<u>City of Chi. v. Morales</u>, 527 U.S. 41, 108, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999)

Thomas, J., *dissenting* (quoting J. Crocker, DUTIES OF SHERIFFS, CORONERS AND CONSTABLES § 48, 33 (2d ed. rev. 1871)).

Police officers are not, and have never been, simply enforcers of the criminal law. They wear other hats -- importantly, they have long been vested with the responsibility for preserving the public peace. *See, e.g.*, O. Allen, DUTIES AND LIABILITIES OF SHERIFFS 59 (1845) ("As the principal conservator of the peace in his county, and as the calm but irresistible minister of the law, the duty of the Sheriff is no less important than his authority is great"); E. Freund, POLICE POWER § 86, p. 87 (1904) ("The criminal law deals with offenses after they have been committed, the police power aims to prevent them. The activity of the police for the prevention of crime is partly such as needs no special legal authority"). Nor is the idea that the police are also peace officers simply a quaint anachronism. In most American jurisdictions, police officers continue to be obligated, by law, to maintain the public peace.

Id., 527 U.S. at 106-107 (citing ARK. CODE ANN. § 12-8-106(b) (Supp. 1997) ("The Department of Arkansas State Police shall be conservators of the peace"); DEL. CODE ANN. Tit. IX, § 1902 (1989) ("All police appointed under this section shall see that the peace and good order of the State . . . be duly kept"); ILL. COMP. STAT. ANN. ch. 65, § 5 11-1-2(a) (Supp. 1998) ("Police officers in municipalities shall be conservators of the peace"); LA. REV. STAT. ANN. § 40:1379 ("(West) Police employees . . . shall . . . keep the peace and good order"); MO. REV. STAT. § 85.561 (1998) ("Members of the police department shall be conservators of the peace, and shall be active and vigilant in the preservation of good order within the city"); N. H. REV. STAT. ANN. § 105:3 (1990) ("All police officers are, by virtue of their appointment, constables and conservators of the peace"); ORE. REV. STAT. § 181.110 (1997) ("Police to preserve the peace, to enforce the law and to prevent and detect crime"); 351 PA. CODE Art. V, ch. 2, § 5.5-200 ("The Police Department . . . shall preserve the public peace, prevent and detect crime, police the streets and highways and enforce traffic statutes, ordinances and regulations relating thereto"); TEXAS CODE CRIM. PROC. ANN., Art. § 2.13 (Vernon 1977) ("It is the duty of every peace officer to preserve the peace within his jurisdiction"); VT. STAT. ANN., Tit. 24, § 299 (1992) ("A sheriff shall preserve the peace, and suppress, with force and strong hand, if necessary, unlawful disorder"); VA. CODE ANN. § 15.2-1704(A) (Supp. 1998) ("The police force . . . is responsible for the prevention and detection of crime, the apprehension of criminals, the safeguard of life and property, the preservation of peace and the enforcement of state and local laws, regulations, and ordinances").

The Savoy Court went on to consider if an officer had law enforcement powers throughout a jurisdiction, or only upon the property of the employer.

> Postal Service police officers have police powers only on United States Postal Service property and have only the powers of a citizen in enforcing District of Columbia law.   40 U.S.C. § 318.
> …
> Unlike municipal police officers, PPOs do not have jurisdiction over all property, public or private, within the physical boundaries of their jurisdiction.

Savoy at 880.

The Plaintiff's police powers in Virginia are derived from the same code section as a State Trooper or a Deputy Sheriff, Va. Code § 19.2-81 (applicable to Conservators of the Peace by operation of Va. Code § 19.2-18), and extend throughout the jurisdiction of Orange County, Virginia.  Pl.'s Ex. A at 2.  As an agent of the State with statutory powers of arrest extending throughout his jurisdiction, the Plaintiff meets the Savoy definition of a "duty appointed law enforcement officer" for the purposes of District of Columbia law.

### b. The Plaintiff is exempt from District of Columbia firearms laws by operation of LEOSA both *ex officio* and by the expressed intent of the Orange County Circuit Court in making his appointment.

For the Plaintiff to be afforded protection under LEOSA,  he need only satisfy each of the following provisions: (1) be an "employee of a governmental agency" who has a photographic identification issued by that agency; and (2) have on-duty "statutory powers of arrest" and authorization by law to prevent, detect, investigate, or prosecute violations of law or supervise those who do so; and (3) agency authorization to carry a firearm on-duty and meet the standards, if any, of his agency "to regularly qualify in the use of a firearm." 18 U.S.C. § 926B. Notwithstanding any of the above, LEOSA will not apply if at the time of arrest the person (4) was the subject of any disciplinary action by

his agency; (5) was under the influence of any substance; or (6) was prohibited by federal law from possessing a weapon.  Id.

The Defendant appears to only contest the Plaintiff's status as an "employee of a governmental agency".  Docket # 7 at 18.  Though, if the Defendant concedes that the Plaintiff meets the remainder of these criteria, this concession alone would afford him exemption under District of Columbia law.  D.C. CODE §§ 7-2502.01 and 22-4505.

To the extent this Court must ascertain Congressional intent in this instance, LEOSA is merely one of many amendments to the Gun Control Act, and United States Supreme Court has held that federal gun laws are to be given their broadest permissible application. Scarborough v. United States, 431 U.S. 563, 575, 52 L. Ed. 2d 582, 97 S.Ct. 1963 (1977).  That prescription now includes LEOSA.

The U.S. House of Representatives Report 108-560 stated that it was Congress' intent to (1) establish parity between state and local law enforcement officers (LEOs) and their federal counterparts who can carry nationwide, (2) provide an additional unpaid homeland security force composed of off-duty LEOs and Retired LEOs, and (3) enable LEOs and Retired LEOs to defend themselves and their families against criminals. H.R. REP. No. 560, 108th Cong., 2nd Sess. 2004 at 3-4.  With that legislative intent in mind, LEOSA was drafted to apply broadly to protect all LEOs and retired LEOs regardless of title so long as they meet all of the law's criteria. See H.R. REP. No. 560 at 54, 55 (2003) (bill applies to "many peace officers that you would not think of as peace officers," for example, park police, transit police, corrections officers, "not just police and sheriff, anybody with arresting powers, game and fisheries, probation and parole officers, and everybody else").

The Defendant relies entirely upon the status of the Plaintiff's present employer to exclude the Plaintiff from LEOSA.

> Plaintiff's allegations cannot satisfy the requirements of LEOSA on its face, however, as he is not an "employee of a governmental agency." In fact, plaintiff is the owner of a "Licensed Private Security Services Business" in Virginia. *See* Plaintiff's Exhibit A.

Docket # 7 at 18 [footnote omitted].  However, by virtue of the employment of Special Conservators of the Peace, themselves law enforcement agents of the Commonwealth, the company itself becomes a state "Criminal Justice Agency" by operation of Virginia law.

> "Criminal justice agency" means (i) a court or any other governmental agency or subunit thereof which as its principal function performs the administration of criminal justice and any other agency or subunit thereof which performs criminal justice activities, but only to the extent that it does so; (ii) for the purposes of Chapter 23 (§ 19.2-387 et seq.) of Title 19.2, *any private corporation or agency which, within the context of its criminal justice activities employs officers appointed under § 15.2-1737, or special conservators of the peace* or special policemen appointed under Chapter 2 (§ 19.2-12 et seq.) of Title 19.2, provided that (a) such private corporation or agency requires its officers, special conservators or special policemen to meet compulsory training standards established by the Criminal Justice Services Board and submits reports of compliance with the training standards and (b) the private corporation or agency complies with the provisions of Article 3 (§ 9.1-126 et seq.) of this chapter, but only to the extent that the private corporation or agency so designated as a criminal justice agency performs criminal justice activities;

VA. CODE § 9.1-101 [emphasis added].

In one of the few criminal cases decided upon an interpretation of LEOSA, New York v. Rodriguez, 2917/06 (N.Y. Sup. Ct. 2006), the New York Supreme Court examined the applicability of LEOSA to a Pennsylvania constable.  The constable was found to not be "personnel of the judicial system… considered 'independent contractors' with respect to the Court system" but still entitled to protection under LEOSA. Rodriguez at 7.

As noted by the Pennsylvania Supreme Court, "a constable is a known officer charged with conservation of the peace, and whose business it is to arrest those who have violated it…It is the constable's job to enforce the law and carry it out, just the same as the job of district attorney's [sic], sheriffs and police generally" (see In re Act 147 of 1990, 528 Pa., at 470, 598 A.2d 985 [citations omitted].

Id. at 7-8.

Constables and deputy constables do not have uniforms and they are not provided with municipal vehicles but rather use their own private cars (see Com. v. Roose, 456 Pa. Super., at 241, 690 A.2d., at 269). They are not paid a salary by any municipal subdivision as police and sheriffs are, but are more like independent contractors whose pay is on a per job basis (see 13 P.S. §§ 63-75; Com. v. Roose, 456 Pa. Super., at 240, 690 A.2d at 269). They are not considered State employees in order to receive legal representation when sued in connection with their duties (see Com. v. Rooose, 456 Pa. Super., at 240, 690 A.2d at 269). No one supervises constables in the way a police chief supervises police officers or a sheriff supervises deputies. No municipality is responsible for their actions in the way a city, borough or township is responsible for its sheriff's office. In fact, the Pennsylvania Supreme Court has found unconstitutional legislation which attempted to place constables under the supervisory authority of the courts (see In re Act 147 of 1990, 528 Pa. 460, 598 A.2d 985 [Pa. 1991].

Despite being termed an "independent contractor" by the Courts, it appears that, with respect to the work done by a constable for a court, the constable is performing "judicial duties" and is in fact "employed" by the court, district justice or judge which engaged his services… Thus, there appears merit to defendant's argument that he is a government employee within the meaning of the term as it is used in 18 U.S.C. § 926B.

Id. at 12-13.

Thus, the fact that the Pennsylvania courts have full power to remove Pennsylvania State Constables from their positions and the fact that they are elected officials, conflicts with the People's theory that Pennsylvania State Constables are not government employees.

Id. at 13.

Compare the Plaintiff's status where he is appointed to office by the Circuit Court, he takes police action on behalf of the State and he is subject to revocation by the Courts. Va. Code. § 19.2-13.

The Virginia Courts have already spoken as to the Plaintiff's eligibility under LEOSA. The Defendant attempts herein to refute this order interpreting Virginia law by a Virginia court of competent jurisdiction expressly stating that the Plaintiff meets these requirements.

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. CONST. Art. IV, § 1. *See also* 28 U.S.C. § 1738.

Indeed, the Circuit Courts of Virginia are best situated to interpret the intended rights and obligations of a person appointed under Virginia law as they apply to a Federal law, particularly where the Court itself made the appointment.

### c. The Defendant's initiation of criminal charges implicates the Plaintiff's individual Second Amendment right.

Parker v. District of Columbia, 478 F.3d 370, 386 (D.C. Cir. 2007), *rehearing, en banc, denied* Parker v. District of Columbia, 2007 U.S. App. LEXIS 11029 (D.C. Cir., May 8, 2007) *certiorari granted* Dist. of Columbia v. Heller, 2007 U.S. LEXIS 12324 (Nov. 20, 2007).

### 5. A *nolle prosequi* is a favorable resolution of the Plaintiff's criminal prosecution for the purposes of a malicious prosecution claim.

The Defendant declaring a *nolle prosequi* of a criminal prosecution its agents wrongfully initiated will not absolve the Defendant of a malicious prosecution claim when no probable cause existed to initiate the proceeding. If the record demonstrates that the *nolle prosequi* is justified or motivated by the lack of merit of the underlying charges,

then it amounts to a resolution of the prosecution in favor of the Plaintiff. *See e.g.* Davis

v. Giles, 769 F.2d 813, 814 (D.C. Cir. 1985).

> Certain types of dispositions that do not result from adjudication of the merits have generally been held not sufficiently favorable to the accused to be indicative of innocence. These include dismissals for lack of subject matter jurisdiction, *see, e.g.*, Heaney v. Purdy, 29 N.Y.2d 157, 159-60, 324 N.Y.S.2d 47, 49, 272 N.E.2d 550 (1971), and dismissals pursuant to N.Y. Crim. Pro. L. § 170.30(1)(a) for failure to allege sufficient facts to support the charge, *see, e.g.*, MacFawn v. Kresler, 88 N.Y.2d at 860, 644 N.Y.S.2d at 487. The principal rationale is that dismissals of these types may not end the state's pursuit of the accused on the same charges, for a renewed prosecution may be commenced in a proper court on a facially sufficient pleading. *See, e.g.*, id. In addition, some other types of dismissals that preclude further prosecution on the same charges are deemed not to be favorable to the accused for purposes of a malicious prosecution claim. These include "adjournments in contemplation of dismissal," *see, e.g.*, Hollender, 58 N.Y.2d at 424-26, 461 N.Y.S.2d at 767-68, which are conditional dismissals that become final if the accused meets certain criteria during a six-month period, see N.Y. Crim. Pro. L. § 170.55 (McKinney 1993). Similarly, dismissals by the prosecution "in the interests of justice" under N.Y. Crim. Pro. L. § 170.40, are generally considered not to be dispositions in favor of the accused. *See, e.g.*, MacLeay v. Arden Hill Hospital, 164 A.D.2d 228, 230-31, 563 N.Y.S.2d 333, 334-35 (3d Dep't 1990), *appeal denied*, 77 N.Y.2d 806, 568 N.Y.S.2d 913 (1991); Miller v. Star, 123 A.D.2d 750, 751, 507 N.Y.S.2d 223, 224 (2d Dep't 1986) (mem.). *See also* Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992) ("as a matter of law" a dismissal in the interests of justice "cannot provide the favorable termination required as the basis for a claim of malicious prosecution"); *but see* Hankins v. Great Atlantic & Pacific Tea Co., 208 A.D.2d 111, 114-16, 622 N.Y.S.2d 678, 680-81 (1st Dep't 1995) (dismissal in the interests of justice can be a favorable termination, depending on the facts and circumstances surrounding the dismissal).

Murphy v. Lynn, 118 F.3d 938, 950-949 (2d Cir.1997).

> The [New York] Court of Appeals, however, specified that a dismissal without prejudice may only qualify as a final termination where "the dismissal represents the formal abandonment of the proceedings by the public prosecutor, for instance, by the entry of a *nolle prosequi*."

Neal v. Fitzpatrick, 250 F. Supp. 2d 153, 155-156 (E.D.N.Y. 2003) (quoting Smith-

Hunter v. Harvey, 95 N.Y.2d 191, 198 (2000) (citing Stevens v Redwing, 146 F3d 538,

546 (8th Cir.1998); Joiner Ins. Agency v Principal Cas. Ins. Co., 684 So 2d 1242 (Miss.

1996))).

CONCLUSION

For these reasons, and for other such reasons as the Court finds to be good and sufficient

cause, the Plaintiff's Motion for a Preliminary Injunction against unlawful prosecution of

the Plaintiff should be GRANTED.  The Defendant's Motion to Dismiss should be

DENIED.

     Respectfully submitted, this 14th day of May, 2008.

Matthew August LeFande
DC Bar #475995
4585 North 25th Road
Arlington VA 22207
Tel: (202) 657-5800
Fax: (202)318-8019
email: matt@lefande.com
Attorney for the Plaintiff



PD-823
Rev. 5/00

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Metropolitan Police Department
Security Officers Management Branch
**DETECTIVE AGENCY LICENSE**

NAME OF AGENCY AND MAILING ADDRESS OF AGENCY FOR WHICH ISSUED

F/a/ KEN INDUSTRIES
15363 NORMAN RD.
CULPEPER, VA 22701

NAME OF OWNER:    ROBERT ORD

LICENSE VALID

FROM    11-01-07

TO      10-31-09

Chief of Police

TYPE OF LICENSE

PRIVATE DETECTIVE AGENCY

LICENSE NUMBER

3036

It is a violation of D.C. Regulation 73-22, "Human Rights Law," to discriminate for any reason other than that of individual permit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, physical handicap, source of income, and place of residence or business. Failure or refusal to comply with the above shall be a proper basis for the revocation or suspension of this license.

**THE LAW REQUIRES THIS LICENSE TO BE POSTED**



# The Daily Washington LAW Reporter

Established in 1874

*1898 Photo of Washington Law Reporter Co.'s composing room managed by Frank B. Crown.*

Volume 129 — Number 89 — Page 877
**Tuesday, May 8, 2001**

*D.C. Superior Court*

## CRIMINAL LAW & PROCEDURE— POLICE

**Postal Patrol Officer employed by U.S. Postal Service is not exempt from the law prohibiting carrying of concealed weapons (D.C. Code § 22-3204) because the job is primarily protecting property .**

### U.S. v SAVOY

D.C. Super. Ct. Crim No. F-5748-98 March 16, 2001 Opinion per Natalia M. Coombs Greene, J.  *K.D. Clark for U.S. J.P. Byrd-Tillman for defendant.*

N.M.C. Greene, J.:  This matter came before the Court on the Defendant's Oral Motion to Vacate Guilty Plea, Oral Motion for Reconsideration of Defendant's Motion to Dismiss and Oral Motion for Expungement of Records, made in open Court on October 27, 2000, the Defendant's Addendum to the Above Motions, filed on November 27, 2000, and the Government's Motion to Confirm that the Defendant is not Excepted from the District of Columbia's Gun Licensure Laws, filed on November 21, 2000.[1]

This case involves the strict firearms control laws in the District of Columbia and presents issues concerning the scope of the terms "police officer" and "law enforcement officer" as related to persons exempt from those laws. The Court examines these questions with respect to the facts presented in this case.

**I.**

The facts adduced during hearings on the motions and during the plea colloquy were essentially as follows. On August 8, 1998, defendant drove into the District of Columbia from Maryland for the purpose of driving a friend home. While doing so, defendant was involved in a minor motor vehicle crash in the 300 block of 37th Street in Southeast Washington. Following the crash, a verbal altercation ensued. During this verbal altercation, the driver of other vehicle[2] (hereinafter referred to as the "other driver") reached into his vehicle and opened the trunk of his car using a remote opening feature. Believing that the other driver might get a weapon from the trunk of his vehicle, defendant retrieved his United States Postal Service issued police badge and identification along with a Beretta semiautomatic pistol from his vehicle. Defendant ordered the other driver to step away from his vehicle. The other driver complied with defendant's commands, whereupon the defendant closed the trunk of the other driver's vehicle. Defendant then left the scene planning to contact the Metropolitan Police Department.  In the meantime, the other driver flagged

*Police* — Cont'd on page 878

MAY 11 2001
Library
D.C. Superior Court
Washington, D.C. 20001

*D.C. Court of Appeals*

## ATTORNEYS — DISCIPLINE

**Attorney is suspended for 6 months nunc pro tunc followed by 2 years probation with conditions, Bar Counsel recommendation for requirement that attorney prove fitness is rejected under deferential standard.**

### IN RE JOSEPH A. LOPES

D.C. App. No. 97-BG-1927 April 12, 2001 Opinion per Schwelb, J. (Farrell and Reid , JJ. concur) *M.E. Baurley for respondent. T.M. Tait, with J.E. Peters, for the Office of Bar Counsel. E.J. Branda, for the Board on Professional Responsibility.*

Schwelb, J:  In a proposed simultaneous disposition of three District of Columbia disciplinary proceedings instituted by our Bar Counsel and one reciprocal discipline case that originated in Maryland, the Board on Professional Responsibility has recommended that Joseph A. Lopes be suspended from practice for six months, *nunc pro tunc* to July 29, 1998, and that his suspension be followed by a two-year period of probation, with conditions. Bar Counsel agrees that Lopes should be suspended for six months, but excepts to the recommended probation, arguing instead that as a condition of

reinstatement following his suspension, Lopes should be required to demonstrate his fitness to practice law. Although Bar Counsel's position is not unreasonable, we apply our deferential standard of review and direct the imposition of discipline consistent with that recommended by the Board. ***.

### LEGAL ANALYSIS

Bar Counsel takes issue with the Board's recommendation in two respects. First, according to Bar Counsel, "the Board erred in concluding that [Lopes] established *Kersey* [520 A2d 321 (1987)] style mitigation for any of his multiple instances of misconduct." Second, Bar Counsel challenges the recommended discipline; she asserts that Lopes should be required, at the conclusion of the six-month suspension

*Discipline* — Cont'd on page 880

### TABLE OF CASES

**D.C. Court of Appeals**
In Re Joseph A. Lopes .. 877

**D.C. Superior Court**
U.S. v Savoy ............... 877

**Also in this issue**
Recent Filings
(D.C. Superior Court) ........ 879
Legal Notices ................. 883
Classifieds ................... 884

# **Opinions**

"the primary duties of
federal police officers are
'the preservation of
peace, the prevention,
detection, and inves-
tigation of crimes; the
arrest or apprehension
of violators; and the
provision of assistance
to citizens in emergency
situations, including the
protection of civil
rights.'"

---

The Daily Washington Law Reporter

ISSN 1066—6095 A newspaper
of general circulation. Published
daily except Saturdays, Sundays
and holidays by:
The Daily Washington Law Reporter Co.
1001 Connecticut Ave. N.W. Suite 238,
Washington, D.C. 20036-5504
(Entrance on K St.)
Phone: 202.331.1700 • Fax: 202.785.8476

Subscription Rates (Includes in-
dex): 1 Year: $229 • 2 Years:
$438 • 3 Years: $647 • Single
copy: $2 (Add sales tax in D.C.)

POSTMASTER:
Send change of address to:
The Daily Washington Law Reporter Co.,
1001 Connecticut Ave., N.W., Suite 238,
Washington, D.C. 20036-5504

Periodicals Postage Paid at Wash-
ington, D.C. (USPS 146-840)
Member—American Court and
Commercial Newspapers, Inc.;
National Newspaper Association

MICHAEL A. SCHUCHAT, Legal Editor
Elizabeth Lewis Enney, President
Kenneth Enney, Secretary
Donald J. Nichols, General Manager

This publication is printed us-
ing a Konica Force 60 printer.

## Police

*Continued from page 877*

down a passing police car. After defendant
returned to the scene, he was arrested and
charged with carrying a pistol without a license.

**II.**

In his motions, defendant claimed that he was
exempt from the law prohibiting the carrying of
concealed weapons, D.C. Code. Ann. § 22-3204
(1981) ("Section 22-3204"), because another
statute, D.C. Code. Ann. § 22-3205 (1981)
("Section 22-3205"), excepts "policemen or
other duly appointed law-enforcement officers"
from that provision.[3]  At the time of the incident
defendant was employed by the United States
Postal Service as a "Postal Police Officer" and
claimed that this job fell within the exemption
outlined in Section 22-3205.  The government
contended that defendant, in his position, was
actually equivalent to a special police officer and
therefore did not fall within the exemption.

The Court agreed to hear arguments on the
motions because the Court was concerned as to
the legal validity of the defendant's guilty plea.
Initially it was not clear that the defendant's
position was that of a special police officer.  One
of the exhibits attached to defendant's sentencing
memorandum was a letter from the Fraternal
Order of Police National Labor Council No. 2 that
indicated that defendant was a Postal Police
Officer.[4]  This Court therefore reviewed relevant
case law to determine the scope of the terms at
issue.

The District of Columbia Court of Appeals has
consistently held that individuals whose job is
primarily to protect property, rather than life,
are not considered "police officers or other duly
appointed law-enforcement officers" for the
purposes of Section 22-3205. *McKenzie v. United
States*, 158 A.2d 912, 914 (D.C. 1960), *Franklin
v. United States*, 271 A.2d 784, 786 (D.C. 1970),
*Timus v. United States*, 406 A.2d 1269, 1272
(D.C. 1979).  Special police officers are not
covered Per Se by Section 22-3205 because, by
statute, they are appointed "for duty in
connection with the property of" their employer.
D.C. Code Ann. § 4-114 (1981).

If defendant was, in fact, a special police
officer at the time of this incident, he would not
fall within the exception found in Section 22-
3205. *McKenzie v. United States*, 158 A.2d 912
(D.C. 1960).  For purposes of Section 22-3204,
the Court of Appeals has held that special police
officers are law enforcement officers while on
duty in the area of his or her assigned duty
location or while travelling without deviation to
and from the special police officer's place of
employment immediately before or immediately

after the period of actual duty.[5]  *Franklin v.
United States*, 271 A.2d 784, 785 (D.C. 1970),
*Timus v. United States*, 406 A.2d 1269, 1272
(D.C. 1979).  Only under those circumstances
would a special police officer fall within the
exemption found in Section 22-3205.

In his capacity as a Postal Service police
officer, defendant is neither a special police
officer as defined by District of Columbia law nor
is he a member of a police department with
statutory police powers in the District of
Columbia. It therefore appeared, from arguments
made and facts adduced at the hearing, that the
critical question was whether, by his
employment, defendant's primary responsibility
as a "police officer" was the protection of life and
therefore a "policeman or other duly appointed
law-enforcement officer" as defined by Section
22-3205.

The defendant's job as a Postal Police Officer
(hereinafter "PPO") is more akin to that of a
special police officer than of a United States Park
Police officer or Metropolitan Police Department
officer. The Postal Service utilizes all of its PPOs
for the protection of Postal Service property and
the mails.  The primary function of PPOs is not
the preservation of life and the maintenance of
law and order.  Rather, PPOs control access to
Postal Service facilities, escort the mails, and
otherwise protect Postal Service property.  Postal
Service manuals refer to PPOs as a security force.
Numerous Memoranda of Understanding between
the PPO's labor union and the Postal Service
explicitly state that no change in responsibility
or authority took place from the time that the
uniformed force was known as a security force
to the force's present incarnation, the Postal
Police.[6]  The hierarchical structure of the
Standard Position Description, *infra*, clearly
indicates that the primary functions of a PPO
involve physical security of property, loss
prevention, and access control.

**III.**

In order to determine whether the defendant
is exempt from Section 22-3204, the Court
looked to the nature of the defendant's position.
The job classification for the defendant's and
other similar positions are set out in a United
States Office of Personnel Management ("OPM")
guide ("OPM Guide").[7]  The defendant's OPM job
classification is "GS-0083 Police Officer".

The OPM Guide provides that the primary
duties of federal police officers are "the
preservation of peace; the prevention, detection,
and investigation of crimes; the arrest or
apprehension of violators; and the provision of
assistance to citizens in emergency situations,
including the protection of civil rights."

**Police** — *Cont'd on page 879*

## Recent Filings in DC Courts

### D.C. SUPERIOR COURT
### CIVIL DIVISION
### NEW CASES
**No., Parties, Action, Demand Amount & Plaintiff's Attorney**

01-1101. D. Pindle v Aramark Corp.. Personan/al Tort: Negligence. Pro-se

01-1102. n/a

01-1103. Primus Automotive Financial Svcs. v L.A. Sinclair. Contract: Collection under $25,000.00. A.M. Hrehororvich

01-1104. Ford Motor Credit Co. v V.W. Strohman. Contract: Collection under $25,000.00. A.M. Hrehororvich

01-1105. n/a

01-1106. Primus Automotive Financial Svcs. v E.A. Gudger. Contract: Collection under $25,000.00. A.M. Hrehororvich

01-1107. n/a

01-1108. n/a

01-1109. A.A. Jefferson, et al. v J. Riddick, et al.. Personal Tort: Negligence, $500,000.00. Pro-se

01-1110. R.R. Jackson v District of Columbia. Personal Tort: Negligence, $500,000.00. Pro-se

01-1111. n/a

01-1112. n/a

01-1113. n/a

01-1114. n/a

01-1115. n/a

01-1116. M.P. Cheeks v MAIF. Contract: Breach of Contract. B.K. Cobbina

01-1117. Sullivan & Mitchell, PLLC, et al. v M. Tyree, et al.. Property Tort: Payment on a Forged Instrument. D.M. Schoenfeld

01-1118. n/a

01-1119. n/a

01-1120. M.A. Ramzan v Amalgamated Casualty Ins. Co., et al.. Contract: Breach of Contract. D.R. White

01-1121. n/a

## Police

*Continued from page 878*

In an administrative decision, the OPM outlined four indicators to determine whether a job has a security-focused mission or a police-focused mission.[8] These indicators are: 1) the basic mission of the organization; 2) arrest authority; 3) training; and 4) patterns of work. As analyzed by the OPM, however, these factors are not dispositive of the issue as to whether the defendant was a policeman or other duly appointed law-enforcement officer under section 22-3205. *Middleton v. United States* 305 A.2d 259 (D.C. 1973). An examination of the factors outlined by the OPM Guide does, however, provide the Court with a useful algorithm for determining whether the defendant falls within the exemption as outlined in section 22-3205. Although the OPM finds that Postal Service police officers are police officers for purposes of job classification, for the reasons set out below, this Court finds that the defendant was not a policeman or other duly appointed law-enforcement officer under Section 22-3205 of D.C. Code.

The mission of the United States Postal Inspection Service's (hereinafter the "Inspection Service") uniformed arm is as follows:

The purpose of the Security Force at any facility is security and protection. Security Force personnel should restrict their activities in all postal workroom areas to routine patrols, as specified in post instructions, and specific emergency requests by postal supervisors. All instances of Security Force personnel being in postal workroom areas, other than routine patrols called for by duty assignments and emergency situations, should be at the direction of the Security Supervisor.

U.S. Postal Service Postal Police Officer's Manual at 211 (1983). By contrast, the mission statement of the Metropolitan Police Department is "[t]o prevent crime and the fear of crime, as we work with others to build safe and healthy communities throughout the District of Columbia."

As detailed in an affidavit submitted in support of the government's opposition, the uniformed force of the Inspection Service was created in 1970 and at that time was referred to as the "Postal Security Force". The basic mission of the Postal Security Force "was to control access to postal facilities, provide protection of postal property and security for postal service-operated buildings." In 1971, that mission was expanded to include responsibility for "controlling access, maintaining order, preventing mail thefts, safeguarding customers and employees, and providing basic security for buildings operated

by the Postal Service." In 1981, as a result of a collective bargaining agreement with the union representing the officers of the security force, the position title was changed from "Security Police Officer" to "Postal Police Officer". The parties agreed that this change did not augment or otherwise change the duties or authority for the members of this security force.[9]

In support of his argument that his position was that of a bona fide police officer, defendant relied upon the Standard Position Description for Postal Police Officers.[10] That portion of the description subsection entitled "Duties and Responsibilities" is reproduced below in its entirety because the language is instructive in divining the true nature of the defendant's employment.

Performs a variety of duties related to the security of a postal installation, its buildings, employees, equipment, mail, and mail-in-transit, under the guidance and instruction of a security supervisor.

Carries a firearm and exercises standard care required by the Inspection Service on firearms and use of reasonable force. Maintains assigned firearms in good conditions.

Receives training in patrolling an assigned area on foot or by motor vehicle to maintain order and the general safeguarding of the facility, property, and employees. Prevents depredation, loss or damage of mail, by making observations in mail handling areas.

Receives training in controlling access to buildings at an assigned post and enforces regulations requiring identification.

As instructed, maintains a log of all incidents reported and a daily log of orders and basic information for the security force.

As instructed, performs hourly checks: accounts for lost and found items, answers the telephone, and processes reports and inquiries.

Responds to emergencies and other conditions, including burglaries and hold-ups, requiring immediate attention to maintain order and to prevent injury or theft to employees or property.

Makes arrests and testifies in court on law violations within assigned authority.

Performs other job related tasks in support of the primary duties.

The defendant specifically cited to numbers seven (7) and eight (8) to support his argument that his job is more analogous to that of a bona fide police officer. A fatal flaw in this argument, however, is that numbers one (1), three (3), four (4), five (5), and six (6) are most analogous to that of a special police officer whose primary

**Police— Cont'd on page 880**

# Opinions *and Filings in the Courts*

## Recent Filings in DC Courts *continued*

01-1122. R. Ageypong v J.N. Phillips. Personal Tort: Negligence, $100,000.00. B.F. Selig

01-1123. T.A. Kennerly, et al. v Douglas Dvlpt. Corp.. Contract: Collection over $25,000.00. B.M. Timian

01-1124. n/a

01-1125. Montague Plumbing & Heating Inc. v I.M. James, et al.. Contract: Interference. Personal Tort: Deceit. $500,000.00. P.A. Artis

01-1126. n/a

01-1127. n/a

01-1128. n/a

01-1129. Patuxent Flooring & Design, Inc. v United American, Inc., etal.. Contract: Collection under $25,000.00. D.B. Lamb

01-1130. District of Columbia, et al. v PSS & Assocs., inc.. Contract: Collection over $25,000.00. R. Herschthal

01-1131. First Select Corp. v M.L. Sweatt. Foreign Judgement. S.A. Kramer

01-1132. Bank of America v E.J. Rangel. Foreign Judgement. S.A. Kramer

01-1133. EMCC, Inc. v R. Emerson. Foreign Judgement. S.A. Kramer

01-1134. Discover Financial Svcs. v R.L. Williams. Foreign Judgement. S.A. Kramer

01-1135. MAIF v J.R.D. Cockrell, Jr.. Insurance/ Subrogation under $25,000.00. B. Rice

01-1136. n/a

01-1137. n/a

01-1138. F. Barnes v G. Bennett. Personal Tort: Automobile, $250,000.00. R.F. Silber

01-1139. n/a

01-1140. n/a

01-1141. B. Zeldis v Marriott Corp., et al.. Personal Tort: Personal Injury, $1 million. J. Strum

## Police

*Continued from page 879*

mission is that of property protection. While both a special police officer and a Postal Police Officer may respond to emergencies, make arrests and testify in court, these are not their primary responsibilities.

An examination of the second prong of the OPM Guide's algorithm is also instructive. Federal police officers have the same police powers on federal property as do those officers given statutory police authority under District of Columbia law.[11] *See* 40 U.S.C. § 318 and D.C. Code. Ann. § 22-581 (1981). Postal Service police officers have police powers only on United States Postal Service property and have only the powers of a citizen in enforcing District of Columbia law. 40 U.S.C. § 318. Provisions do exist to extend statutory police powers found in D.C. Code Ann. § 23-581 (1981) to Postal Service Police Force. D.C. Code Ann. § 4-192 (1981). The Postal Service can enter into a cooperative agreement with the Metropolitan Police Department coordinated through the United States Attorney for the District of Columbia to "assist the [Metropolitan Police] Department in carrying out crime prevention and law enforcement activities in the District of Columbia. *Id.* However, no such agreement between the Postal Service and the Metropolitan Police Department was in place at the time of defendant's arrest.[12]

A review of the third and fourth prongs of the OPM Guide's algorithm is instructive. United States Postal Service police officers receive approximately 10 weeks of training at the Federal Law Enforcement Training Center at Brunswick, Georgia. Special Police Officers, by contrast, receive approximately one (1) week of private training. Metropolitan Police Department officers receive 600 hours, or 15 weeks of training at the Maurice T. Turner, Jr. Institute of Police Science. From the record, it is impossible to determine the type of training received by Postal Police Officers. Specifically, the Court cannot determine whether the primary emphasis of the Postal Service training is on the protection of life or property. The OPM states that the pattern of work for security guards is oriented toward the protection of property while the work of police officers is oriented toward maintaining law and order. It is clear, however, from the record that the Postal Service employs Postal Police Officers for the primary purpose of securing Postal Service property and controlling access to said property.

Less important to this analysis is the physical jurisdiction of the PPOs. The physical jurisdiction of PPOs extends only to the physical boundaries of Postal Service property – property owned or controlled by the federal government.

Unlike municipal police officers, PPOs do not have jurisdiction over all property, public or private, within the physical boundaries of their jurisdiction.

Because it cannot be shown that defendant's position as a PPO was akin to a policeman or other duly appointed law enforcement officer or that any agreement existed between the Metropolitan Police Department and the United States Postal Service pursuant to D.C. Code Section 4-192, the Court cannot conclude that defendant was exempt from the provisions of the District of Columbia's gun licensure laws. It may be said, however, that this conclusion presents some interesting questions given the state of the law and the apparent change in job title for this particular position. Although an interesting question, the Court must be guided by an honest analysis of the facts and the law.

Accordingly, it is this 16th day of March, 2001

ORDERED that Defendant's Motions are hereby DENIED. It is further

ORDERED that Government's Motion is hereby GRANTED. It is further

ORDERED that the Defendant's guilty plea, entered on October 3, 2000, stands.

*SO ORDERED.*

### Endnotes

[1] Defendant, pursuant to a plea agreement with the government, pleaded guilty on October 3, 2000 to the charge of attempted carrying a pistol without a license, a lesser included offense to carrying a pistol without a license. The Court, prior to sentencing, invited the parties (after some discussion) to submit pleadings on the issue as to whether defendant might in fact be exempt from the District of Columbia gun licensure laws .

[2] The driver of the other vehicle was cited by Metropolitan Police Department officers for Following Another Vehicle Too Closely, in violation of 18 D.C.M.R. 2201.4.

[3] The defendant also claimed, in the alternative, that he was exempt from Section 3204 because he had intended to take the weapon to a pistol range for target practice before he was delayed and diverted into the District of Columbia. This defense is not discussed herein because: 1) the defendant's residence, where he apparently kept the weapon, and the firing range are located in Prince George's County, Maryland, and driving from the defendant's residence to the firing range would not normally necessitate passing through the District of Columbia; and 2) defendant did not advance this argument at the time of the hearing.

[4] The Fraternal Order of Police is a law-enforcement related labor union representing United States Postal Service police officers, among others; and is, according to the union, "the world's largest organization of sworn law enforcement officers".

[5] Special police officers in the District of Columbia are imputed to have a registration certificate for the

*Police — Cont'd on page 881*

*Filings in the Courts and* **Opinions**

## Recent Filings in DC Courts
*continued*

01-1142. In Re: Mahzad Essalat . Changing Name to Read: Mahzad Madeleine Essalat

01-1143. n/a

01-1144. US Bank Nat'l. Assn v C. James, et al.. Contract: Breach of Contract. H.N. Bierman

01-1145. n/a

01-1146. n/a

01-1147. US Bank Nat'l. Assn v E.A. Ferebee. Contract: Breach of Contract. H.N. Bierman

01-1148. B.L. Ripley v Washington Ctr., et al.. Personal Tort: Malpractice Medical, $10 million. B.H. Kim

01-1149. In Re: Jean Mikhail Meneses. Changing Name to Read: Michael Jean Menese

01-1150. Trinity College v A. Hill. Contract: Collection under $25,000.00. J.O. Curley



**The Daily Washington LAW Reporter**

1001 Connecticut Ave., N.W.
Suite 238
Washington, D.C. 20036-5504

(202) 331-1700
Fax (202) 785-8476
www.DClawreporter.com
lawreporter@mindspring.com

## Police

*Continued from page 880*

employer-issued weapon and ammunition because their employers hold the registration certificate for the firearm and the ammunition. *See Timus v. United States,* 406 A.2d 1269, 1273 (D.C. 1979). Therefore, special police officers are not held liable for the crimes of possession of an unregistered firearm and possession of unregistered ammunition.

[6] Through collective bargaining, the Postal Service made changes to the uniformed service. On September 19, 1981, the Postal Service and the then Federation of Postal Security Police signed an agreement to change the name of the uniformed officers from "Security Police Officer" to "Postal Police Officer" and issue a new type of duty holster. On April 2, 1985, the two organizations signed an agreement issuing badges inscribed with the words "Postal Police Officer". On October 12, 1994, the Fraternal Order of Police and the Postal Service signed an agreement to change the graphics on their vehicles from "Security Force" to "Postal Police."

[7] Classification Programs Div., OPM, *Grade Evaluation Guide for Police and Security Guard Positions* (1988). Furthermore, previous administrative decisions are used to help classify positions.

[8] *See* 8 Digest of Significant Classification Decisions and Opinions 6 (U.S. Office of Personnel Management 1986).

[9] Affidavit of Lawrence Katz at 3, *United States v. Savoy* (F-5748-98). *See also* Memorandum of Understanding (Sept. 19, 1981); Memorandum of Understanding between the United States Postal Service and Federation of Postal Police Officers (Apr. 2, 1985); Memorandum of Understanding between the United States Postal Service and Fraternal Order of Police National Labor Council, U.S.P.S. No. 2. (Oct. 12, 1994).

[10] Standard Position Description – Postal Police Officer (A), PPO-05 at 1 (Feb. 8. 1990).

[11] The government argues that postal service police officers are akin to special police officers "because of their limited authority to carry their service issued weapon." This argument is faulty. In *United States v. Pritchett,* the court noted that the District of Columbia Department of Corrections issued firearms to their officers only while on duty at the District of Columbia jail. 470 F.2d 455, 461 (D.C. Cir. 1972). In that case, the court found that District of Columbia corrections officers fall within the exemption outlined in § 22-3205. As Postal Service property, the Inspection Service's regulation of the use of their own firearms, badges, and identifications by employees does not impact upon District of Columbia weapons laws.

[12] Government's Motion to Confirm that the Defendant is not Excepted from the District of Columbia's Gun Licensure Laws at 25 (F-5478-98).

## Discipline

*Continued from page 877*

recommended by the Board, to demonstrate his fitness for the practice of law. In the alternative, if the court declines to require proof of rehabilitation, then Bar Counsel asks us to impose conditions of probation more exacting and more intrusive than those proposed by the Board.

### A. The standard of review.

In conformity with the applicable rule of court, our review of the Board's findings and recommendations is deferential; ***.

D.C. App. R. XI, § 9 (g)(1). The quoted rule "endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise." *In re Goffe,* 641 A.2d 458, 464 n.7 (D.C. 1994) (per curiam) (quoting *In re Haupt,* 422 A.2d 768, 771 (D.C. 1980) (per curiam)). The Board's recommended discipline comes to the court with a strong presumption in favor of its imposition. *Goffe, supra,* 641 A.2d at 463 (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C. 1987) (en banc)). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Goffe, supra,* 641 A.2d at 463-64. "We must therefore, at the very least, accord respectful consideration to the Board's views." *In re Marshall,* 762 A.2d 530, 536 (D.C. 2000).

### B. Kersey mitigation.

***. The *Kersey* issues have been vigorously contested before the Hearing Committee and the Board, and they have been ably briefed in this court. Without reciting in detail all of the relevant testimony, we are satisfied, upon careful consideration of the record as a whole, that the Board's analysis and recommendation are reasonable and consistent with our precedents. Under these circumstances, we must defer to the findings of the Board.

We begin our consideration of this issue with the first element of Lopes' burden under *Kersey.* It is substantially undisputed that, at the relevant times, Lopes was suffering from depression, a disability that has been held to warrant *Kersey* mitigation. *See, e.g., In re Peek,* 565 A.2d 627, 631-32 (D.C. 1989). Bar Counsel and counsel for the Board have energetically debated whether Lopes' depression was comparable to the depression suffered by the respondents in *Peek* and in some of our other cases. In our view, however, there was clear and convincing evidence to support the Board's finding that

**Discipline** — *Cont'd on page 882*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:          PART 41
------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,   :

                                       :  Indictment Number 2917/06

            -against-                  :

ARTHUR RODRIGUEZ,                      :  Decision & Order

                                       :
                    Defendant.
------------------------------------x
ZWEIBEL, J.:

 The defendant is charged with Criminal Possession of a
Weapon in the Third Degree, a violation of Penal Law § 265.02(4).
The People allege in substance that on April 12, 2006, at
approximately 7:30 p.m. in the vicinity of 1250 5th Avenue, New
York, New York, the defendant possessed a loaded firearm in his
vehicle.  There does not seem to be any dispute over whether
defendant possessed a loaded firearm.  The defendant is a law
enforcement officer, namely, a Pennsylvania Constable, authorized
to carry a concealed weapon in Pennsylvania.  The People concede
that defendant is a constable.  The only real issue in this case
is whether by virtue of his status as a law enforcement officer,
defendant was entitled to carry his weapon across State lines and
therefore, is exempt from prosecution for a violation of Penal
Law § 265.02(4) under either or both New York State and Federal
law.

 In order to flesh out the record on this issue, the Court,
on October 20, 2006, held a hearing with respect to defendant's

1

motion to dismiss. The sole witness at the hearing was defendant, Manuel Rodriguez, who I found to be credible.[1]

Prior to defendant testifying, the Assistant District Attorney ("ADA") stated, that with respect to defendant's presence in New York County for service of a warrant, she was able to verify that there was an active September 2005 warrant from Pennsylvania for a person located in Kings County, New York. According to the ADA, she spoke to Pennsylvania Judge David Leh, who was the judge who signed the warrant on September 2, 2005, who further confirmed that the warrant was assigned thereafter to defendant.[2] However, Judge Leh was uncertain as to when and if defendant had attempted to execute the warrant.

The ADA also commented on the fact that in the Grand Jury, the arresting officers testified to being aware that defendant

---

[1]Although the People had approximately one month to prepare for this hearing, they apparently notified their officers the day prior to the hearing. Prior to sending through that notification, no one spoke to the officers or verified their availability. Needless to say, the officers did not appear nor did the People have any information as to the reason for the officers' failure to appear. In fact, the People did not know if the officers actually received the notifications. The Court denied the People's request for an adjournment because of the length of time the People had to prepare for the hearing, and because the People did not even know if the officers were available Monday.

[2]On cross-examination, when asked about when he received the assignment to execute the warrant in question, Constable Rodriguez did not remember the exact date that the warrant was issued nor could he state on what date he did what in his attempts to locate the person in the warrant and execute it.

2

was a Pennsylvania Constable and that his duties included serving Pennsylvania warrants.

Defendant testified that his name is Manuel Rodriguez, not Arthur Rodriguez as stated in the indictment, and that he is a Pennsylvania State Constable, employed by the Commonwealth of the State of Pennsylvania, as a sworn law enforcement officer.[3] According to Constable Rodriguez, this is his second term as an elected Constable. His duties include courtroom security, transporting prisoners, executing warrants, both criminal and civil, "PFA's", "standby", and service of court papers. The warrants are executed wherever they are issued. Constable Rodriguez is authorized to collect fines upon confirming the identity of the person so named in the warrant. According to the constable, constables, including himself, go outside the state to locate the person named in the warrant and to try to resolve it. Constables of Pennsylvania are authorized to carry a gun[4] and that he personally was authorized, qualified and certified to

---

[3]Constable Rodriguez denied on cross-examination that he ever told the officers who arrested him that his name was Arthur Rodriguez.

[4]Although authorized to carry a gun in Pennsylvania by virtue of their status as constables, constables are not issued weapons by the State of Pennsylvania but rather they purchase their own weapons. Defendant also admitted having a personal license in Pennsylvania to carry a firearm.

carry a weapon as a Pennsylvania State constable.[5]

Constable Rodriguez testified on cross-examination that he has two jobs and that one of those jobs is his full-time employment as a Constable in Pennsylvania. According to the Criminal Justice Administration ("CJA") form based on an interview of the defendant at the time of his arraignment, defendant also stated that his full-time profession was construction worker. Defendant also stated that he told the person from CJA that he was a Pennsylvania State Constable.

On April 12, 2006, at approximately 4:30/5:00 p.m., Constable Rodriguez was sitting in his legally parked car on 5th Avenue. He was waiting for his friend Aurora Flores to come down so that he could give her a lift on his way to Brooklyn to execute a warrant[6]. Constable Rodriguez intended to contact the person named in the Brooklyn warrant and see whether the warrant could be "expunged" there and then. After executing the Brooklyn warrant, Constable Rodriguez was going to go through the Holland Tunnel and head back to Pennsylvania, executing the other four

_____

[5]The Court took judicial notice of the Statutes of Pennsylvania that do in fact exempt constables, as sworn law enforcement officers, from the licensing requirement and permits constables to carry a weapon without a license under the Pennsylvania Firearms Act, citing Title 18 of the Pennsylvania Statutes, section 6106,subdivision (b)(1) [18 Pa.C.S.A. § 6106(b)(1)].

[6]The warrant was for a summary offense, payment of a surcharge upon the person's named in the warrant having pled guilty to public drunkenness and misconduct.

4

warrants he had in his possession on that date along the way.

While he was waiting in his parked car, Constable Rodriguez was approached by police officers who came alongside his vehicle on the right side. Constable Rodriguez rolled down his window and the officers asked him "What you doing here? Can you—you have any identification because this looks like an unmarked car, out of state plates, Pennsylvania plates?" In response, Constable Rodriguez showed the officers his identification and shield.

According to Constable Rodriguez, the officers proceeded to block his car in its parking space. By this time, Ms. Flores had arrived and said "Let's go." Constable Rodriguez told her, "We can't go nowhere. These guys got me blocked in."

The officers then exited their vehicle and approached defendant on his left side and asked him for additional identification. Constable Rodriguez testified that no matter what form of identification he showed the officers, the officers told him that the identification was fake. Because of the officers scepticism with respect to defendant's identifications, Constable Rodriguez reached up and removed all the warrants he was executing from his visor. He showed the officers the warrants and informed them that they were issued by the State of Pennsylvania and that he is an authorized officer. The officers allegedly told him that the warrants were fake as well.

5

Constable Rodriguez also testified that Ms. Flores tried to tell the officers that his identification was not fake and that he was a Pennsylvania Constable. According to the constable, the officers told Ms. Flores to shut up.

The officers asked Constable Rodriguez whether he was carrying a weapon. Constable Rodriguez said yes. According to the constable, he was carrying a concealed weapon in a shoulder rig/holster under his shirt.

Constable Rodriguez stated that at the time of his arrest, he was acting in his official capacity as a Pennsylvania State Constable.

The Court notes that Penal Law 265.20(a)[11] specifically states that Penal Law § 265.02 does not apply to "[p]ossession of a firearm ... by a police officer or sworn peace officer of another state while conducting official business within the state of New York." Thus, if a constable is considered a peace officer in the State of Pennsylvania and defendant was conducting official business within the State of New York, he may be exempt from prosecution pursuant to Penal Law § 265.20(a)[11].

First, this Court must determine whether a constable is a "peace officer" in Pennsylvania. It is clear to this Court that constables are peace officers in Pennsylvania whose central functions and activities partake of exercising executive powers. Because constables are considered "related staff" who serve the

6

unified judicial system but are not personnel of the judicial system and are not supervised by the courts, they are considered "independent contractors" with respect to the Court system.

Statutes govern the election and qualifications of constables; the appointment and qualifications of deputies; the removal of constables; the duties and liabilities of constables; the fees of constables; and actions against constables or their sureties.  The Court takes judicial notice of the various Pennsylvania statutes governing constables, including those in Title 13 of the Pennsylvania Commonwealth Statutes ("Pa.C.S.") section 40 through 46 and Tile 18 of the Pennsylvania Commonwealth Statutes ("Pa.C.S.") section 6106.  In fact, 13 PS § 40 is entitled, "Peace Officers" and states that "Constables... shall perform all those duties authorized or imposed on them by statute."  Additionally, according to the Supreme Court of the State of Pennsylvania, a "constable is a peace officer" (see <u>In re Act 147 of 1990</u>, 528 Pa., at 470, 598 A.2d, at 990).  As noted by the Pennsylvania Supreme Court, "a constable is a known officer charged with conservation of the peace, and whose business it is to arrest those who have violated it.  By statute in Pennsylvania, a constable may also serve process in some instances....  As a peace office, and as a process server, a constable belongs analytically to the executive branch of government, even though his job is obviously related to the

7

courts. It is the constable's job to enforce the law and carry it out, just the same as the job of district attorney's, sheriffs and the police generally" (see In re Act 147 of 1990, 528 Pa., at 470, 598 A.2d 985 [citations omitted]). In fact, Pennsylvania constables have the right in Pennsylvania to conduct warrantless arrests for felonies and breaches of the peace, including warrantless arrests for felony violations of the drug laws (see Commonwealth v. Taylor, 450 Pa. Super. 583, 596, 677 A.2d 846, 852 [Pa. 1996]). They also have statutory powers of arrest in certain situations (see e.g. 32 P.S. §582; 53 P.S. §13349). Moreover, they are exempt from the need to have a carry license for their weapon pursuant to 18 Pa.C.S. § 6106. Therefore, this Court finds that a Pennsylvania constable is a "peace officer" of another state as that term is used in Penal Law § 265.20(a)[11].

Second, this Court must determine whether defendant was in New York to conduct official business within the State of New York. According to defendant, he was in the State of New York on official Pennsylvania Court business. Allegedly, defendant was here to serve warrants, which he had in his possession at the time of his arrest, issued by the Pennsylvania courts. If defendant was in fact in New York on official business at the time of his arrest, it seems to this Court that he is exempt under State law from prosecution. Based on the officer's testimony, and there is nothing in the Grand Jury minutes, which

8

contradicts the officer's testimony, this Court finds that defendant was in New York on official business. This Court does not view as relevant the fact that he was legally parked while awaiting a friend to whom he had offered a lift on his way to Brooklyn to serve and/or collect on an active warrant.[7]

Apparently recognizing this might cast doubt on whether he was in New York County on official business, defendant argues that, pursuant to 18 U.S.C. §629B, he is permitted to carry a weapon across state lines and that the instant prosecution is pre-empted by the Federal statute. 18 U.S.C. § 926B, also known as H.R.218 or the Law Enforcement Officers Safety Act of 2004, states, in pertinent part:

> (a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b)....

> (c) As used in this section, the term "qualified law enforcement officer" means an employee of a governmental agency who--

> (1) is authorized by law to engage in or supervise the prevention, detection, investigation,

---

[7]The Court notes that there is no indication in the Grand Jury minutes that defendant was not parked legally or that he was parked by a hydrant. In fact, it appears from the Grand Jury minutes that the officers did not approach defendant because of any illegality but rather because the officers believed that defendant's vehicle might be an unmarked police vehicle and that he might be an officer needing assistance.

or prosecution of, or the incarceration of any person
for, any violation of law, and has statutory powers of
arrest;

(2) is authorized by the agency to carry a firearm;

(3) is not the subject of any disciplinary action by
the agency;

(4) meets standards, if any, established by the
agency which require the employee to regularly
qualify in the use of a firearm;

(5) is not under the influence of alcohol or another
intoxicating or hallucinatory drug or substance; and

(6) is not prohibited by Federal law from receiving a
firearm.

(d) The identification required by this subsection
is the photographic identification issued by the
governmental agency for which the individual is
employed as a law enforcement officer....

The Court notes that there is absolutely no case law or

articles written about this statute apart from the Congressional

Record statements at the time of its enactment.    Thus, this is

truly a case of first impression.

Looking at H.R. 218, in terms of the known facts in this

case, the Court believes that defendant qualifies under it.    As

defendant points out, the office of the constable is mandated in

the Pennsylvania State Constitution.    Constables are elected,

sworn law enforcement officers with mandatory training

requirements and state powers to make an arrest, despite their

lack of government funding.    They are independent employees of

the State of Pennsylvania whose identification cards are issued

10

by the County as a State identification. Additionally, they are
paid for their services by the District Courts and/or the
Comptroller's office.

The Court notes that the Grand Jury minutes reflect that
defendant showed the arresting officers his badge and his
official identification identifying him as a Pennsylvania
constable, a fact that the officers themselves admit they
verified. As already noted, the People basically concede that
defendant is a constable.

Additionally, 42 Pa.C.S. § 2942 states that:

> [w]hile a constable is performing duties other
> than judicial duties, regardless of whether or not
> he is certified under this subchapter, he shall not
> in any manner hold himself out to be active as an
> agent, employee or representative of any court,
> district justice or judge.

The clear implication of this statute is that when a constable is
performing judicial duties, he is an agent employee and/or
representative of the court, district justice or judge assigning
the judicial duties to him. In this case, the People
independently verified, by speaking with the assigning judge,
that the warrant defendant claimed to be serving was assigned to
defendant and was still active. Thus, he was clearly performing
a judicial duty.

Moreover, a constable is elected within an electoral
district, i.e. a ward, borough or the like. The elected
constable, with the approval of the court, appoints deputy

constables (see 13 P.S. § 21; Com. v. Roose, 456 Pa. Super. 238, 240, 690 A.2d 268, 269 [Pa. Sup. 1997]; aff'd 551 Pa. 410, 710 A.2d 1129 [Pa. 1998]).  Constables and deputy constables do not have uniforms and they are not provided with municipal vehicles but rather use their own private cars (see Com. v. Roose, 456 Pa. Super., at 241, 690 A.2d, at 269).  They are not paid a salary by any municipal subdivision as police and sheriffs are, but are more like independent contractors whose pay is on a per job basis (see 13 P.S. §§ 63-75; Com. v. Roose, 456 Pa. Super., at 240, 690 A.2d, at 269).  They are not considered State employees in order to receive legal representation when sued in connection with their duties (see Com. v. Roose, 456 Pa. Super., at 240, 690 A.2d, at 269).  No one supervises constables in the way a police chief supervises police officers or a sheriff supervises deputies.  No municipality is responsible for their actions in the way a city, borough or township is responsible for its sheriff's office.  In fact, the Pennsylvania Supreme Court has found unconstitutional legislation which attempted to place constables under the supervisory authority of the courts (see In re Act 147 of 1990, 528 Pa. 460, 598 A.2d 985 [Pa. 1991]).

Despite being termed an "independent contractor" by the Courts, it appears that, with respect to the work done by a constable for a court, the constable is performing "judicial duties" and is in fact "employed" by the court, district justice

12

or judge which engaged his services. Again, according to defendant's attorney, defendant was actively performing judicial duties at the time of his arrest as he was on his way to serve warrants within New York State which were in his possession at the time of his arrest. Thus, there appears merit to defendant's argument that he is a government employee within the meaning of the term as it is used in 18 U.S.C. § 926B.

Moreover, pursuant to 13 P.S. § 31 [Intemperance, neglect of duty, malfeasance or misfeasance, petition; verification; additional security], the Pennsylvania courts of quarter session

> ...also have full power, on petition of any citizen or citizens of said county, setting forth the complaint, and verified by affidavit, to inquire into the official conduct of any constable of said county ... and to decree the removal of such constable from office, and to appoint a suitable person to fill the vacancy...

Thus, the fact that the Pennsylvania courts have full power to remove Pennsylvania State Constables from their positions and the fact that they are elected officials, conflicts with the People's theory that Pennsylvania State Constables are not government employees.

Based on this analysis, the Court finds that defendant is an "employee of a government agency" as that phrase is used in 18 U.S.C. § 926B. The Court has reviewed all the other requirements listed under this section and finds that Pennsylvania constables come under the protection of 18 U.S.C. § 926B. Accordingly, the

13

motion to dismiss the instant indictment is granted.

Moreover, looking at the legislative history behind this law, it seems that defendant, in his official capacity of constable and in performance of his statutorily authorized duties, was the type of individual the statute wanted preempted from prosecution.  Congress drafted this legislation to help stop and deter crime throughout the country.

Assuming _arguendo_ that Pennsylvania State Constables are "government employees," then defendant's prosecution is preempted by 18 U.S.C. § 926B, also known H.R. 218 or the Law Enforcement Officers Safety Act of 2004 appears to have merit.  Accordingly, the motion for inspection and/or dismissal of the Grand Jury minutes, is granted to the extent that the Court has examined the Grand Jury minutes in camera and found the evidence before the Grand Jury to be legally insufficient.  The People did not inform the Grand Jury that the instant prosecution was preempted if they found that the constable was here in the furtherance of his official duties or if he qualified as a law enforcement officer under H.R. 218.  Accordingly, the motion to dismiss the indictment is granted.

Defendant's property, which was seized from him at the time of his arrest, is to be returned forthwith unless this Decision, Order and Judgment is stayed by virtue of the People filing an appeal from it in the Appellate Division, First Department.

14

This constitutes the decision, order and judgment of this
Court.

ENTER:

Hon. Ronald A. Zweibel, J.S.C.

Dated: November 3, 2006

15

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ROBERT L. ORD**<br><br>                                    **Plaintiff**<br><br>**v.**<br><br>**DISTRICT OF COLUMBIA**<br><br>                                    **Defendant** |

**Case Number**
**1:08-CV-00704**

**Judge John D. Bates**

**ORDER OF PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65 (a), the Plaintiff has moved for a

Temporary Restraining Order and for a Preliminary Injunction.   The Plaintiff seeks an

Order restraining the Defendant, its officers, members, agents, servants, employees,

attorneys and those acting in active concert or participation with them from certain

conduct and activities.

Upon consideration of Plaintiff's Complaint, Affidavits, Exhibits, the examination

of witnesses and argument of counsel, if any, the Court finds that the Defendant and its

counsel were given notice of the Plaintiff's intention to move herein for a Preliminary

Injunction and that the Defendant was given the opportunity to respond.

The Court further finds that the Plaintiff's motion is well taken and that it clearly

appears that (1) there is a substantial likelihood the Plaintiff will prevail on the merits of

his Complaint; (2) the Plaintiff will suffer immediate and irreparable injury unless an

injunction issues; (3) an injunction will not substantially injure the Defendant; (4) and

that the public's interest is best served by the granting of the injunction.

Therefore, the Plaintiff is entitled to such an injunction against the Defendant as hereinafter set forth:

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that as of today's date, and until such time as the Plaintiff's Complaint is adjudicated before this Court, the Defendant, its officers, agents, members and employees and those in active concert and participation with said Defendant and all other persons to whom knowledge of this order shall come, be and hereby are enjoined and restrained from arresting or prosecuting the Plaintiff for any alleged violation of D.C. Code § 7-2502.1 or other alleged weapons violation in which the Plaintiff would be entitled to exemption as a law enforcement officer.

IT IS FURTHER ORDERED:

The Defendant's Motion to Dismiss is DENIED.

SO ORDERED, this _____ day of _____, 2008

_____
Judge John D. Bates